# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LIBERTY MUTUAL INSURANCE　　　:
COMPANY, <u>et</u> <u>al.</u>,　　　　　　　　　:
　　　　　　Plaintiffs　　　　　　:　　　　No. 2:16-cv-00483
　　　　　　　　　　　　　　　　:
　　　　v.　　　　　　　　　　　:　　　　(Judge Kane)
　　　　　　　　　　　　　　　　:
VINCENT GEMMA, <u>et</u> <u>al.</u>,　　　　　　:
　　　　　　Defendants　　　　　　:

## MEMORANDUM

Before the Court are Defendants Vincent Gemma ("Gemma"), and Everest Insurance,

LLC, Everest Consulting Group, L.P.,[1] and Everest Consulting Group, LLC's (collectively,

"Everest Defendants"), motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

(Doc. Nos. 46, 49.)  For the reasons that follow, the Court will grant in part and deny in part the

motions to dismiss.

## I.　　BACKGROUND

### A.　　Procedural Background

Plaintiff Liberty Mutual Insurance Company ("Liberty Mutual"), initiated the above-

captioned action by filing a complaint against Gemma on April 22, 2016.  (Doc. No. 1.)  In its

first complaint, Liberty Mutual asserted ten counts against Gemma, which set forth claims for

breach of contract, breach of fiduciary duty/duty of loyalty, conversion, misappropriation of

trade secrets under the Pennsylvania Uniform Trade Secrets Act, a violation of the Computer

Fraud and Abuse Act, 18 U.S.C. § 1030, unjust enrichment, tortious interference with a contract,

tortious interference with prospective economic advantage, and unfair competition, as well as a

request for injunctive relief.  (<u>Id.</u> at 22-29.)  On the same date that it filed its complaint, Liberty

---

[1] Everest Consulting Group, L.P., is listed in the caption of this action as doing business as
Northwood Realty Services.

Mutual also filed a motion for a preliminary injunction against Gemma. (Doc. No. 2.) On May 2, 2016, the Honorable Cathy Bissoon conducted a conference with the parties via telephone (Doc. No. 12), in which the court "encouraged the parties to attempt to reach agreement on Plaintiff's requested injunctive relief" (Doc. No. 16). Subsequently, the parties submitted a standstill agreement on May 10, 2016, under which Gemma agreed to adhere to certain restrictions pending an Order from the Court as to the status of Liberty Mutual's motion for injunctive relief. (Id.) The Court approved the standstill agreement on May 10, 2016. (Doc. No. 18.)

On May 16, 2016, Gemma filed an answer to Liberty Mutual's complaint. (Doc. No. 22.) The Court then issued an Order dated June 6, 2016, which mandated that all expedited discovery would be due by July 29, 2016. (Doc. No. 26.) On the same date, Gemma filed an amended answer to Liberty Mutual's complaint. (Doc. No. 27.) On June 28, 2016, Liberty Mutual moved for a protective order (Doc. No. 28), which the court granted, subject to certain revisions (Doc. No. 29). On December 15, 2016, Liberty Mutual filed an amended complaint against Gemma and the Everest Defendants, setting forth ten counts. (Doc. No. 37.)

Subsequently, on March 30, 2017, Gemma and the Everest Defendants each filed the instant motions to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. Nos. 46, 49.) Gemma submitted a brief in support of his motion on March 30, 2017. (Doc. No. 47.) Liberty Mutual submitted a brief in opposition to Gemma's motion to dismiss on April 28, 2017. (Doc. No. 55.) Gemma did not submit a reply brief. As to their motion, the Everest Defendants submitted a brief in support on March 30, 2017. (Doc. No. 50.) Liberty Mutual submitted a brief in opposition to the Everest Defendants' motion to dismiss on April 28, 2017. (Doc. No. 54.) On May 5, 2017, the Everest Defendants filed a reply brief.

(Doc. No. 56.) Accordingly, as they are either fully briefed, or the requisite time period for responsive briefing has expired, both motions are ripe for disposition.

### B. Factual Background[2]

#### 1. Liberty Mutual's Sale of Insurance

The allegations in the amended complaint stem from events surrounding Gemma's former employment as a sales representative with Liberty Mutual, departure from Liberty Mutual, and subsequent professional involvement with the Everest Defendants. (Doc. No. 37.) Liberty Mutual "offers a wide range of property-casualty insurance products and services to both individuals and businesses, including personal[,] automobile, homeowners, personality liability and life insurance." (Id. ¶ 14.) Its customers "are its policyholders," and both current and prospective policyholders "seeking Liberty Mutual insurance provide sensitive and confidential information to Liberty Mutual in order to determine the extent of coverage." (Id. ¶ 15.) Consequently, its revenues "are based, in large part, on the premiums it receives from its policyholders." (Id. ¶ 17.) To that end, Liberty Mutual employs sales associates to market its products to customers and "develops group savings plus, affinity, marketing agreements or relationships with groups . . . that assist Liberty Mutual in advertising, marketing and selling Liberty Mutual products to the group members and/or their clientele." (Id. ¶¶ 18-19.) Specifically, Liberty Mutual, which has a sales office located in Wexford, Pennsylvania, "had such relationships with Northwood, a residential real estate company serving the Greater Pittsburgh region." (Id. ¶¶ 20-21.)

#### 2. Gemma's Employment with Liberty Mutual

---

[2] The relevant facts are taken from Liberty Mutual's amended complaint. (Doc. No. 37.) The Court limits its discussion of the factual background of this case only to those factual allegations relevant for the purpose of deciding the motions presently before the Court.

Gemma began his employment with Liberty Mutual as a sales representative in 1998 and was "assigned to and worked out of the Wexford office until his resignation on April 7, 2016." (Id. ¶ 22.) After receiving multiple promotions over the course of his employment, at the time of his resignation, Gemma was an executive sales representative, "the highest level of sales representative in the company." (Id.) In this capacity, he worked extensively on Liberty Mutual's "affinity/group savings and/or marketing programs, especially with Northwood," which is a "full-service real estate firm, with offices throughout the Greater Pittsburgh area . . . [that] provides services to its customers at all steps of the real estate process . . . assisting customers with their insurance needs." (Id. ¶¶ 28-29.)

In 2005, "Liberty Mutual entered into affinity/group savings and marketing relationships with Northwood," through which "Northwood markets Liberty Mutual by offering its customers the opportunity to receive quotes for insurance coverage underwritten by Liberty Mutual, and discounted affinity/group savings pricing." (Id. ¶ 30.) Gemma played a central role in the beginning of this relationship between Liberty Mutual and Northwood, and served as "the lead contact person who directed and managed Liberty Mutual's affinity/group savings and marketing programs with Northwood."[3] (Id. ¶ 31.) In this regard, Gemma "actively worked with Northwood on behalf of Liberty Mutual, frequently traveling to its offices and spending time there developing relationships and good will with Northwood personnel."[4] (Id. ¶ 36.) Liberty Mutual "devoted significant resources" to the development of its relationship with Northwood,

---

[3] As a result of this business relationship between Liberty Mutual and Northwood, "Northwood promoted its relationship with Liberty Mutual on its website," listing insurance services provided by Liberty Mutual as available to Northwood's customers and providing a link to Liberty Mutual's webpage. (Id. ¶¶ 32-34.)

[4] In addition, Gemma attended sales meetings at Northwood, which "report[ed] on the Liberty Mutual affinity/group savings and marketing programs, as well as Northwood Managers Meetings." (Id. ¶ 36.) Further, Gemma "spent considerable time soliciting and developing relationships with Northwood personnel on behalf of Liberty Mutual" during his workday. (Id.)

citing as examples Gemma's roles on the board of the Northwood Charitable Foundation and as the former chair of Northwood's golf tournament on multiple occasions. (Id. ¶ 37.)

As a result of its relationship with Northwood, Liberty Mutual "received a significant number of customer leads and developed a significant number of policyholders." (Id. ¶ 38.) In addition, "Liberty Mutual offered, and Northwood accepted, substantial discounts off Liberty Mutual's insurance pricing for Northwood and its customers." (Id. ¶ 41.) Gemma continued to act as Liberty Mutual's primary contact person with respect to Northwood (Id. ¶ 42), and from November 9, 2015 to April 7, 2016 (the date of Gemma's resignation), Gemma "sold over 100 policies to customers of Northwood" on behalf of Liberty Mutual (Id. ¶ 44).

### 3.  Exchange of Confidential Information Related to Policyholders

In his capacity as a sales representative, Gemma gained access to information regarding Liberty Mutual's current and prospective policyholders, and "[t]hose existing and prospective policyholder referral relationships are the lifeblood of Liberty Mutual's business." (Id. ¶¶ 45-46.) Because of the nature of his position as a sales representative, Gemma communicated with current and prospective policyholders, "determin[ed] the needs and preferences of policyholders/referral sources, solicit[ed] those policyholders/referral sources, [and] introduc[ed] product lines to those policyholders/referral sources . . . all for Liberty Mutual." (Id. ¶ 47.) Gemma was thus required to develop and gather information about policyholders, which "is treated by Liberty Mutual as highly confidential and valuable," and he "agreed expressly to ensure the confidentiality of that information."[5] (Id. ¶¶ 48-49.)

---

[5] Liberty Mutual states that, consequently, Gemma "had access to the confidential, proprietary and competitively-sensitive books, records and information of Liberty Mutual, and the confidential information and trade secrets contained therein, including . . . policyholder contact information." (Id. ¶ 51.)

Further, "[s]ince the beginning of his employment with Liberty Mutual," and as a condition of his employment and eligibility for compensation and various benefits, Gemma "executed a series of agreements with Liberty Mutual containing confidentiality and restrictive covenant provisions." (Id. ¶ 55.) According to Liberty Mutual, the most recent agreement of this type is the Gemma Agreement, which Gemma signed in relation to the Liberty Mutual 2016 US Executive Sales Representatives Compensation Plan ("2016 Comp Plan"), "which provided Gemma the opportunity to earn substantial bonus compensation beyond his base salary as well as bonus compensation beyond what he received in 2015." (Id. ¶ 56.) His signing of the Gemma Agreement was required in order for him to receive any benefits under the 2016 Comp Plan, and in 2016, he was paid by Liberty Mutual according to the terms of the 2016 Comp Plan. (Id. ¶ 57.) The agreement required, inter alia, that Gemma "maintain the confidentiality of Liberty Mutual's confidential information and . . . abide by certain post-employment restrictive covenants." (Id. ¶ 58.)

Specifically, Section 1 of the Gemma Agreement states: "I also agree not to divulge to, share with, or permit access by any person, company or organization not currently employed by or affiliated with the [Liberty Mutual] to such [p]roperty both during and after my tenure as an employee of [Liberty Mutual]."[6] (Id. ¶ 60.) In addition, pursuant to Section 2 of the Gemma Agreement, Gemma agreed not to engage in certain activities "for two years following the termination of his employment" with Liberty Mutual. (Id. ¶ 61.) Such activities include the following:

> [S]ell or attempt to sell products or services of the type or kind offered by or
> through the Company to any person, company or organization to whom [he]
> previously provided any service or to whom [he] previously quoted or sold

---

[6] The relevant portions of the Gemma Agreement are attached as Exhibit A to Liberty Mutual's amended complaint. (Doc. No. 37-2.)

insurance products offered by or through the Company during the last twelve months of [his] employment with the Company.

[C]ontact, advise, induce or assist any policyholder or prospective policyholder of the Company, to whom insurance obtained from or through the Company was sold or quoted, be it a person, company or organization, to reduce, replace, lapse, surrender or cancel any insurance obtained from or through the Company.

[S]olicit or attempt to solicit the purchase of products or services of the type or kind offered by or through the Company by, or contact, any person, company or organization to whom [he] previously provided any service or to whom [he] previously quoted or sold insurance products offered by or through the Company during the last twelve months of [his] employment with the Company.

(Id.) (alterations in original) (citations omitted).  Additionally, in regard to marketing/affinity accounts, including those associated with Northwood, Gemma agreed that during the two-year period following the termination of his employment with Liberty Mutual, he would not:

contact, solicit or attempt to solicit the purchase of products or services of the type or kind offered by or through the Company, or the establishment of any group discount program with any affinity account, group savings plus account, marketing or networking account (including but not limited to mortgage companies, auto dealers, and real estate companies) for whom [he] served as the Company contact during the last twelve months of [his] employment with the Company.

(Id. ¶ 62) (alterations in original).

### 4.    Gemma's Relationship with the Everest Defendants

Prior to his resignation from Liberty Mutual in April of 2016, Gemma and the Everest Defendants "secretly discussed and planned Gemma's departure from Liberty Mutual and the establishment of a competing insurance agency," and "[a] centerpiece of their plan was Gemma's involvement in the planned solicitation of Northwood personnel for customers for the new insurance agency."  (Id. ¶ 66.)  According to Liberty Mutual, this collaboration among Defendants involved Northwood's Executive Vice President and Member of Everest Insurance, Wendy West, "sen[ding] Gemma the contact information for the law firm that is representing Gemma" in the above-captioned action because "Everest was aware of the . . . Gemma

Agreement and understood that Gemma working with and joining Everest would implicate the Gemma Agreement . . . and/or Gemma's common law obligations to Liberty Mutual." (Id. ¶ 67.) In addition, approximately ten months before Gemma's resignation, "Defendants reserved the 'Everest Insurance, LLC' name," and "[a]t least as early as 2015, Defendants began working on behalf of Everest Insurance . . . [with] Gemma performing such work during normal business hours when he was being paid by, and should have been working on behalf of, Liberty Mutual." (Id. ¶¶ 69-70.)

Liberty Mutual also alleges that prior to his resignation, Gemma "actively encourag[ed] Everest to take actions that would negatively affect the Liberty Mutual-Northwood relationship, such as removing Liberty Mutual from the Northwood website and discontinuing the discount." (Id. ¶ 73.) In addition, Gemma and Everest "worked together to marginalize other Liberty Mutual sales representatives in Northwood offices so that when Gemma eventually resigned from Liberty Mutual, he would be in a position to steer future business to Everest," and due to "misleading comments and representations" from Defendants, "Liberty Mutual assigned Gemma additional Northwood offices at the expense of other Liberty Mutual Sales representatives."[7] (Id. ¶ 74.)

In addition, Liberty Mutual asserts that "[i]n competing with Liberty Mutual, Defendants also utilized confidential Liberty Mutual information," alleging that in October of 2015, Gemma "emailed to his personal email account an Excel file entitled '10-07-15 book.xlsx,'" which "contained Liberty Mutual confidential information, such as premium amounts." (Id. ¶ 77.) He then deleted the email from the "sent" folder of his Liberty Mutual email account and forwarded

---

[7] Other alleged conduct on the part of Defendants includes an instruction from an Everest executive to Northwood personnel "to discontinue allowing Liberty Mutual representatives[] to come to Northwood offices," which "did not apply to Gemma and Gemma continued to frequent Northwood offices." (Id. ¶ 75.)

that email from his personal email account to an Everest employee on November 10, 2015, therefore also transmitting the Excel spreadsheet. (Id. ¶¶ 78-79.) Liberty Mutual maintains that Defendants "used and/or disclosed information contained in the Excel spreadsheet in connection with the planning and/or operation of Everest insurance."[8] (Id.) Along with this alleged correspondence, "Gemma had numerous communications with numerous Northwood personnel concerning Defendants' new venture in competition with Liberty Mutual and Gemma attended a meeting of Northwood managers to discuss Everest Insurance and . . . solicited them to direct potential insurance business away from Liberty Mutual and/or to Everest."[9] (Id. ¶ 82.) In addition, the Everest Insurance LLC Operating Agreement "was effective at least as of April 1, 2016 and . . . Gemma was a Member and Manager" of Everest Insurance LLC. (Id. ¶ 81.) Accordingly, while still employed by Liberty Mutual, Gemma "was a 25% owner of, and executive of, Everest, a direct competitor to Liberty Mutual," and he "had a conflict of interest[,] which was known to Everest." (Id.)

In addition, Liberty Mutual alleges that in the two days prior to Gemma's resignation, Gemma "sent at least 25 emails from his Liberty Mutual email account to his personal Gmail account." (Id. ¶ 90.) According to Liberty Mutual, the emails "included a total of 25 attachments containing Liberty Mutual's confidential, trade secret information concerning more than one thousand (1,000) Liberty Mutual policyholders, and dozens of Liberty Mutual referral sources." (Id. ¶ 91.) More specifically, the first twenty-four emails each included an attached

---

[8] Liberty Mutual also claims that prior to his resignation, Gemma "forwarded Liberty Mutual information, including underwriting information, to his personal email address and after his resignation forwarded the information to his Everest insurance email." (Id. ¶ 80.)
[9] Liberty Mutual's amended complaint contains several additional allegations of similar misconduct, including alleged statements made by Gemma, when he was still employed by Liberty Mutual, that indicated he planned on competing with Liberty Mutual in the future. (Id. ¶¶ 83-88.)

Excel document "contain[ing] confidential, trade secret information concerning Liberty Mutual policyholders," and the twenty-fifth email included an Excel spreadsheet "from the June 15, 2015 Northwood golf outing, containing contact information for dozens of Northwood personnel, and other actual or potential referral sources." (Id. ¶ 92.) For purposes of reference, Liberty Mutual's amended complaint places the documents into three separate categories: "(1) Category A – Property and Casualty Insurance; (b) Category B – Life Insurance; and (c) Category C – Marketing Account Personnel." (Id. ¶ 93.) The documents in Category A include "Excel documents listing policyholder information related to insurance sales that Gemma made from 2001 through 2003, and 2005 through 2016," and those in Category B include similar information.[10] (Id. ¶¶ 94, 103.) Additionally, Category C consists of an Excel document that "includes the phone numbers and email addresses for dozens of individuals, along with their company affiliation, including at least 56 Northwood agents," and those listed in the spreadsheet "were participants in the June 15, 2015 golf tournament by Northwood." (Id. ¶¶ 105-06.)

### 5. Gemma's Resignation from Liberty Mutual

Gemma resigned from his position with Liberty Mutual on April 7, 2016, one day "after he emailed massive amounts of Liberty Mutual confidential, trade secret information to his personal Gmail account." (Id. ¶ 110.) Subsequently, Liberty Mutual's area manager reviewed the Gemma Agreement with Gemma and "remind[ed] him of its restrictions with respect to existing or prospective policyholders and affinity and marketing accounts, as well as its confidentiality and return of information provisions." (Id. ¶ 111.) The area manager specifically stated that the restrictions "would apply to Northwood relationships, and also stated that, if

---

[10] For example, one document in Category A consists of confidential information about "hundreds of Liberty Mutual policyholders," including, inter alia, their names, contact information, policy numbers, types of insurance policies purchased, premium amounts, and referral sources. (Id. ¶ 96.)

Gemma had kept any policyholder information, it must be returned."[11]  (Id.)  During this

meeting, Gemma responded by stating that he did not have any policyholder information, and

also referred to "relationships at Northwood [as] being 'fair game,' or words to that effect."  (Id.

¶ 113.)  Lastly, after resigning from Liberty Mutual, Gemma remained involved with Northwood

personnel by, for example, teaching insurance-related classes to Northwood personnel and "with

Defendants' assistance, [] actively prospecting Northwood personnel for business."  (Id. ¶ 115.)

## II.    STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to

dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ.

P. 12(b)(6).  The legal standards governing pleading practice in federal court have shifted to a

"more heightened form of pleading, requiring a plaintiff to plead more than the possibility of

relief to survive a motion to dismiss."  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir.

2009).  To avoid dismissal, all civil complaints must set out "sufficient factual matter" to show

that the claim is facially plausible.  Id.  The plausibility standard requires more than a mere

possibility that the defendant is liable for the alleged misconduct.  Indeed, "where the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"

Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (citing Fed. R. Civ. P. 8(a)(2)).  Factual allegations

must be enough to raise a right to relief above the speculative level."  Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 555 (2007).

---

[11] Liberty Mutual maintains that "[t]his was not the first time that Gemma had been told about
the restrictive covenants and their scope," alleging that even before he signed the Gemma
Agreement in January of 2016, Gemma was informed that "should [he] leave Liberty Mutual, the
restrictive covenants in the Gemma Agreement would prevent him from continuing with his
relationships with Northwood, including precluding communications with Northwood personnel
concerning the sale of insurance."  (Id. ¶ 112.)

The United States Court of Appeals for the Third Circuit has identified the following steps a district court must take when evaluating the sufficiency of a complaint's allegations as tested against a Rule 12(b)(6) motion: (1) identify the elements a plaintiff must plead to state a claim; (2) discard any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (citation and quotation marks omitted).

In evaluating whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all factual allegations in the complaint and construe all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010). A court "need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss," Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997), and must disregard any "formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555. Additionally, a court may not assume that a plaintiff can prove facts that the plaintiff has not alleged. Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519, 526 (1983). In deciding a Rule 12(b)(6) motion, the court may consider, in addition to the facts alleged on the face of the complaint, any exhibits attached to the complaint, "any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'" Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure, § 1357 (3d ed. 2004)).

## III.    DISCUSSION

Liberty Mutual's amended complaint sets forth ten counts.[12]  (Doc. No. 37.)  The Court will address each claim in turn, beginning with the claims asserted only against Gemma.

### A.    Claims Against Gemma

#### 1.    Breach of Contract (Count I)

Liberty Mutual states that the basis for this claim is that the Gemma Agreement "constitutes a binding and enforceable contract between Gemma and Liberty Mutual, which contains confidentiality provisions and reasonable restrictive covenants that are necessary to protect Liberty Mutual's legitimate business interests."  (Id. ¶ 118.)  Liberty Mutual's breach of contract claim against Gemma is that Gemma's actions constituted a breach of certain portions of the Gemma Agreement.  (Id.)  In support of his motion to dismiss, Gemma maintains that Liberty Mutual has failed to state a claim for breach of contract because (1) the complaint does not allege that the non-competition portion of the Gemma Agreement was supported by valuable consideration, and (2) the complaint does not state a breach of the non-competition portion of the Gemma Agreement because it fails to define certain terms within the scope of the Agreement. (Doc. No. 47 at 4-6.)

##### a.    Adequate Consideration

According to Gemma, because he was already an employee of Liberty Mutual when he signed the Gemma Agreement and was therefore an at will employee, there was no modification of the employment relationship that would amount to adequate consideration, and as a result, "[t]he [c]omplaint is deficient in that there is no allegation that Gemma received new or valuable consideration to support the restrictive covenants in the [Gemma] Agreement[,] nor does the

---

[12] Liberty Mutual has withdrawn its sixth count, which set forth a claim for a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  (Doc. Nos. 37 at 30, 53 at 6 n.1.)

[c]omplaint identify such consideration." (Id. at 5.)  In opposition, Liberty Mutual argues that

the Gemma Agreement was supported by valuable consideration on the basis of Gemma's

participation in the 2016 Comp Plan, as "Gemma was expressly told that his participation in the

2016 Comp Plan was contingent on his execution of the Gemma Agreement," and he "received

bonus compensation per the terms of the 2016 Comp Plan." (Doc. No. 55 at 8-9.)

The Pennsylvania Supreme Court has articulated the requirements for enforceable

restrictive covenants as follows:[13]

> Restrictive covenants are enforceable only if they are: (1) ancillary to an
> employment relationship between an employee and an employer, (2) supported by
> adequate consideration; (3) the restrictions are reasonably limited in duration and
> geographic extent; and (4) the restrictions are designed to protect the legitimate
> interests of the employer.

Socko v. Mid-Atlantic Sys. of CPA, Inc., 126 A.3d 1266, 1274 (Pa. 2015) (citing Hess v.

Gebhard & Co. Inc., 808 A.2d 912, 917 (Pa. 2002); Piercing Pagoda, Inc. v. Hoffner, 351 A.2d

207, 210 (Pa. 1976); Morgan's Home Equip. Corp. v. Martucci, 136 A.2d 836, 844 (Pa. 1957)).

In addition, Pennsylvania law mandates that:

> [w]hen a non-competition clause is required after an employee has commenced
> his or her employment, it is enforceable only if the employee receives "new" and
> valuable consideration – that is, some corresponding benefit or a favorable change
> in employment status.  Sufficient new and valuable consideration has been
> found . . . to include, inter alia, a promotion, a change from part-time to full-time
> employment, or even a change to a compensation package of bonuses, insurance
> benefits, and severance benefits.

Id. at 1275 (footnotes omitted) (citations omitted).

The Court concludes that the amended complaint sufficiently alleges that the restrictive

covenants in the Gemma Agreement were supported by adequate consideration.  Liberty Mutual

maintains that Gemma signed the Gemma Agreement in 2016 "in connection with, and as a

---

[13] The parties agree that Pennsylvania law governs the Court's analysis of Liberty Mutual's
breach of contract claim.  (Doc. Nos. 47 at 4-6, 55 at 6-9.)

condition to be eligible for" the 2016 Comp Plan, which afforded him "the opportunity to earn substantial bonus compensation beyond his base salary as well as bonus compensation beyond what he received in 2015." (Doc. No. 37 ¶ 56.) The compensation-related benefits entailed by the 2016 Comp Plan fit within the various types of benefits, as described <u>supra</u>, which have been held to constitute new and valuable consideration for purposes of enforcing a restrictive covenant. <u>See</u>, <u>e.g.</u>, <u>Socko</u>, 126 A.3d at 1275. In addition, as Liberty Mutual notes in opposition to Gemma's motion (Doc. No. 55 at 8), the Third Circuit has held that participation in this type of plan constitutes adequate consideration in the context of a restrictive covenant. <u>See</u> <u>L.B. Foster Co. v. Barnhart</u>, 615 F. App'x 63, 64 (3d Cir. 2015) (concluding that employee's participation in incentive plan was adequate consideration to support restrictive covenant because employer did not have legal obligation to offer incentive plan to employee and employee received benefit from plan in exchange for signing non-competition agreement). Therefore, the Gemma Agreement was supported by adequate consideration on the basis of Gemma's participation in the 2016 Comp Plan.

### b. Sufficiency of Allegations in the Amended Complaint

Gemma also argues that Liberty Mutual's amended complaint is insufficient to survive a Rule 12(b)(6) motion because it "fails to state in what way Gemma violated the terms of the non-compete provision of the [Gemma Agreement]." (Doc. No. 47 at 6.) Section 2(c) of the Gemma Agreement, which includes the non-competition provision at issue, states that regarding the marketing/affinity accounts held by Liberty Mutual, which included those related to Northwood, Gemma agreed not to:

> contact, solicit or attempt to solicit the purchase of products or services of the type or kind offered by or through the Company, or the establishment of any group discount program with any affinity account, group savings plus account, marketing or networking account (including but not limited to mortgage

companies, auto dealers, and real estate companies) for whom [he] served as the Company contact during the last twelve months of [his] employment with the Company.

(Doc. No. 37 ¶ 62) (citing Doc. No. 37-2).

The Court concludes that the amended complaint sets forth sufficient factual allegations in support of Liberty Mutual's claim that Gemma breached the non-competition provision in the Gemma Agreement. As Liberty Mutual notes, the amended complaint alleges that Gemma engaged in extensive communication with Northwood about conducting business with Everest while he was employed by Liberty Mutual, and that these communications concerned accounts that were covered by the non-competition agreement. (Doc. Nos. 37 ¶¶ 31, 82-83, 115, 117-21, 55 at 10-11.) Accordingly, the Court finds that Liberty Mutual's amended complaint sets forth a valid claim for breach of contract, and Gemma's motion to dismiss (Doc. No. 46), is denied as to Count I of Liberty Mutual's amended complaint.

### 2. Breach of Fiduciary Duty/Duty of Loyalty (Count II)

Gemma argues that the amended complaint does not allege facts that would constitute any breach of a duty toward Liberty Mutual, and that even if the complaint alleged such facts, Gemma "was permitted" to engage in such conduct. (Doc. No. 47 at 7-8.) Gemma states that Liberty Mutual "makes broad unsupported allegations but does not identify what confidential information was misappropriated by Gemma, what confidential information was disclosed by Gemma, or for what purposes it was used," and that any conduct by him with regard to Northwood or the Everest Defendants did not constitute a breach of fiduciary duty because Gemma was an at-will employee who only made "preparations to compete" upon the termination of his employment with Liberty Mutual. (Id. at 7-8) (citing Synthes, Inc. v. Emerge Med., Inc., 25 F. Supp. 3d 617, 667 (E.D. Pa. 2014)).

Conversely, Liberty Mutual asserts that Gemma's conduct prior to his termination in April of 2016 amounts to a breach of the fiduciary duty and duty of loyalty owed to Liberty Mutual, as his conduct contradicted notions of undivided loyalty toward his employer and avoiding conflicts of interest. (Doc. No. 55 at 12) (citing <u>Maritrans v. Pepper Hamilton & Sheetz</u>, 602 A.2d 1277, 1283 (Pa. 1992)). In addition, Liberty Mutual argues that Gemma's conduct constitutes a breach of fiduciary duty because courts have permitted such claims when employees are alleged to have used their "employer's time or any trade secrets in making preparations to leave, or otherwise engage in conduct directly damaging [their] employer during the period of employment. (<u>Id.</u> at 13) (citing <u>Latuszewski v. Valic Fin. Advisors, Inc.</u>, Civil Action No. 03-0540, 2007 WL 4462739, at *18 (W.D. Pa. Dec. 19, 2007)).

An employee who takes steps to compete with his current employer prior to his termination does not automatically commit a breach of fiduciary duty, yet certain conduct may give rise to a claim for breach of fiduciary duty in specific circumstances. <u>See</u>, <u>e.g.</u>, <u>Synthes</u>, 25 F. Supp. 3d at 667. In <u>Synthes</u>, the district court described the obligations of employees prior to termination as follows:

> [E]mployees at will do not breach a fiduciary duty to the employer by making preparations to compete upon termination of employment provided the employee does not use the confidential information of his employer, solicit the customers of his employer, or otherwise engage in conduct directly damaging his employer during the period of employment.

<u>Id.</u> (alteration in original) (quoting <u>Oestreich v. Envtl. Inks & Coatings Corp.</u>, No. Civ. A. 89-8907, 1990 WL 210599, at *6 (E.D. Pa. Dec. 17, 1990)). The court added that an employee "may not, however, 'solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's.'" <u>Id.</u> (citing

Restatement (Second) Agency § 393, cmt. E (1958); <u>Spring Steels, Inc. v. Molloy</u>, 162 A.2d 370, 375 (Pa. 1960)).

The Court concludes that the amended complaint states a claim for breach of fiduciary duty or duty of loyalty against Gemma, as the facts alleged by Liberty Mutual support this claim. Liberty Mutual claims, <u>inter alia</u>, that Gemma planned to solicit Northwood personnel as customers for a new, competing insurance agency, Gemma engaged in efforts to promote the new insurance agency while he was still employed by Liberty Mutual and during hours in which he was meant to be working on behalf of Liberty Mutual, that Gemma sent documents belonging to Liberty Mutual to affiliates of Everest, and that Gemma sent information that belonged to Liberty Mutual to his Everest email address before his termination. (Doc. No. 37 ¶¶ 66, 70-80.) Consequently, Liberty Mutual has alleged that prior to his resignation, Gemma acted in a way that undermined the interests of Liberty Mutual. Such allegations are sufficient to state a claim for breach of fiduciary duty/duty of loyalty. <u>See</u>, <u>e.g.</u>, <u>Synthes</u>, 25 F. Supp. 3d at 667. Accordingly, the Court denies Gemma's motion to dismiss (Doc. No. 46), as to Count II of the amended complaint.

**B.      Claim Against Everest Defendants: Aiding/Abetting Breach of Fiduciary Duty (Count III)**

The Everest Defendants move to dismiss Count III on three grounds: (1) "the allegations fail to inform each Everest Defendant of its alleged role" because the terms "Everest" and "Everest Defendants" refer to all three of the Everest Defendants, (2) Liberty Mutual has not pled sufficient facts in regard to damages, and (3) the allegations "do not sufficiently indicate how any Everest Defendant provided the requisite substantial assistance or encouragement." (Doc. No. 50 at 7-8.) In opposition, Liberty Mutual states that it has adequately "described the relationship amongst the Everest Defendants, and the role that those entities played in aiding and

abetting Gemma," that the amended complaint has satisfied the applicable pleading standard

with respect to damages, and that the amended complaint sets forth sufficiently pled allegations

as to aiding and abetting on the part of the Defendants.  (Doc. No. 54 at 11-12.)

A claim for aiding and abetting a breach of fiduciary duty under Pennsylvania law

requires three elements: "(1) a breach of a fiduciary duty owed to another; (2) knowledge of the

breach by the aider and abettor; and (3) substantial assistance or encouragement by the aider and

abettor in effecting that breach."  Synthes, 25 F. Supp. 3d at 674 (citing Reis v. Barley, Snyder,

Senft & Cohen, 667 F. Supp. 2d 471, 492 (E.D. Pa. 2009)).  As the Court has already determined

supra that the amended complaint is sufficient in setting forth facts as to the first element, a

breach of a fiduciary duty, the Court is primarily concerned with whether Liberty Mutual has

articulated facts supporting the second and third elements, and the Court concludes that Liberty

Mutual has done so.

The amended complaint states that prior to Gemma's resignation, "Defendants secretly

discussed and planned Gemma's departure from Liberty Mutual and the establishment of a

competing insurance agency."  (Doc. No. 37 ¶ 66.)  Additionally, "[b]oth Gemma and Everest

were acutely aware of Gemma's obligations to and covenants with Liberty Mutual," as

demonstrated by Northwood's Executive Vice President providing Gemma with contact

information for legal counsel to represent him in the instant litigation, which allegedly occurred

"because Everest was aware of the predecessor agreement to the Gemma Agreement" and

understood that Gemma would implicate his contractual obligations to Liberty Mutual by

working with Everest.  (Id. ¶ 67.)  Such facts are sufficient to support the second element, that

the Everest Defendants had knowledge of Gemma's alleged breach of his fiduciary duty to

Liberty Mutual.  See e.g., Mifflinburg Telegraph, Inc. v. Criswell, No. 4:14-cv-0612, 2017 WL

3917736, at *5-6 (M.D. Pa. Sept. 7, 2017). Furthermore, the amended complaint is sufficient with regard to the third element – that the defendants provided "substantial assistance and encouragement" as to the underlying breach of fiduciary duty – because Liberty Mutual has alleged that the Everest Defendants took various measures to assist Gemma prior to his resignation, such as assigning Gemma additional Northwood offices at the expense of other sales representatives employed by Liberty Mutual, receiving Liberty Mutual's proprietary information through emails from Gemma, and instructing Northwood personnel "to stop allowing Liberty Mutual representatives into Northwood offices." (Doc. No. 37 ¶¶ 69-76.) Such interactions between Gemma and the Everest Defendants support a claim for aiding and abetting a breach of fiduciary duty.[14] Accordingly, the Everest Defendants' motion to dismiss is denied as to Count III of the amended complaint.

### C. Claims Against All Defendants

#### 1. Conversion (Count IV)

Count IV of the amended complaint sets forth a claim for conversion against all Defendants on the grounds that Defendants "exercised unauthorized and unlawful dominion and control over Liberty Mutual's property, and have thereby converted that property to their own use" as a result of Gemma's alleged disclosure of Liberty Mutual's "trade secrets and confidential information" to the other Defendants. (Id. ¶¶ 134-38.) In addition, Liberty Mutual

---

[14] See Mifflinburg Telegraph, 2017 WL 3917736, at *5-6. In Mifflinburg Telegraph, the district court noted that "[t]he Third Circuit has recently held that an employee can 'breach[] her fiduciary duty by forwarding confidential e-mails before she quit.'" Id. at *6 (second alteration in original) (quoting Miller v. Cty. of Centre, 702 F. App'x 69, 72 (3d Cir. 2017)). In addition, the court stated that one of the defendants "owed a fiduciary duty to her former employer, and breached it by taking emails and customer lists from [the plaintiff's] computers," and that "[i]n Pennsylvania, a business entity can aid and abet [a] breach of fiduciary duty." Id. (citing Parks Miller, 2017 WL 3278883, at *3; Koken v. Steinberg, 825 A.2d 723, 732 (Pa. Commw. Ct. 2003)).

avers that "Defendants have diminished the value of Liberty Mutual's property, including its confidential information and trade secrets, by disclosing and using Liberty Mutual's property for their own benefit and/or for the benefit of a Liberty Mutual competitor." (Id. ¶ 139.)

Under Pennsylvania law, conversion "is the deprivation of another's right of property, or use of possession of a chattel, or other interference therewith without the owner's consent and without legal justification." Prudential Ins. Co. of Am. v. Stella, 994 F. Supp. 318, 323 (E.D. Pa. 1998) (citing Universal Premium v. York Bank & Trust Co., 69 F.3d 695, 704 (3d Cir. 1995)); Norriton E. Realty Corp. v. Central-Penn Nat' l Bank, 254 A.2d 637, 638 (Pa. 1969); Eisenhauer v. Clock Towers Assoc., 582 A.2d 33, 36 (Pa. Super. 1998). In addition, conversion may be committed in multiple ways: "(1) acquiring possession of the chattel with the intent to assert a right to it which is adverse to the owner; (2) transferring the chattel and thereby depriving the owner of control; (3) unreasonably withholding possession of the chattel from one who has a right to it; and (4) misusing or seriously damaging the chattel in defiance of the owner's rights." Id. (citing Fort Wash. Res., Inc. v. Tannen, 846 F. Supp. 354, 361 (E.D. Pa. 1994)).

The amended complaint states sufficient facts in support of a conversion claim against Gemma. Liberty Mutual alleges that it had maintained various records containing information as to its "existing and prospective policyholders, underwriting methods and positions and premiums," Gemma acknowledged that these records "were the sole and exclusive property of Liberty Mutual," Gemma agreed not to disclose such property to a third party or use it for personal gain, Defendants exercised unauthorized control over this property, and Liberty Mutual was harmed by this conduct. (Doc. No. 37 ¶¶ 134-41.) Under the standard described supra, the amended complaint adequately alleges that Gemma acquired possession of Liberty Mutual's property in a way that was adverse to Liberty Mutual's interests, transferred the property by

21

sending it to himself when he "was already a 25% owner of Everest Insurance," and withheld the property from Liberty Mutual, who did not intend for Gemma to send the documents to himself or use them to benefit Everest Insurance.  See Prudential, 994 F. Supp. at 323.

In addition, the Court rejects Gemma's argument that Liberty Mutual's conversion claim is preempted by the Pennsylvania Uniform Trade Secrets Act ("PUTSA").  The Court will not dismiss Plaintiff's conversion claim due to possible PUTSA preemption at the Rule 12(b)(6) stage because doing so may mean that Liberty Mutual "may be left without a remedy" if it is subsequently determined "that the information at issue . . . does not constitute a trade secret."[15] PNC Mortg. v. Superior Mortg. Corp., Civil Action No. 09-5084, 2012 WL 628000, at *15 (E.D. Pa. Feb. 27, 2012).  Additionally, the Court agrees with Liberty Mutual that, based on Liberty Mutual's assertion that Gemma "converted Liberty Mutual information, e.g. underwriting information, that is confidential but that is not alleged to constitute trade secrets under the PUTSA," (Doc. Nos. 37 ¶ 80, 55 at 19), a conclusion that PUTSA preempts the conversion claim would be improper because information that does not constitute a trade secret, but is still valuable to the plaintiff, may warrant protection through common law tort claims.  See, e.g., Cenveo Corp. v. Slater, No. 06-cv-2632, 2007 WL 527720, at *4 (E.D. Pa. Feb. 12, 2007) ("[W]ithout clear intent, it should not be assumed that . . . [the statute] was intended to abrogate common law conversion claims based on the taking of information that, though not a trade secret, was nonetheless of value to the claimant.");  see also Hill v. Best Med. Int'l, Inc., Civil

---

[15] In PNC, the district court was tasked with deciding a motion for summary judgment.  See PNC, 2012 WL 628000 at *1.  However, even at the summary judgment stage, the court noted that dismissal of a common-law tort claim on the basis of PUTSA preemption would be improper, as it may leave a plaintiff "without a remedy" if it were later determined that the information involved was not a trade secret.  See id. at *15.  Accordingly, given that the motions presently before this Court are motions to dismiss pursuant to Rule 12(b)(6), the Court is inclined to deem the conversion claim not preempted by PUTSA.

Action Nos. 07-1709, 08-1404, 09-1194, 2011 WL 5082208, at *15 (W.D. Pa. Oct. 25, 2011) (acknowledging that "[e]ven after the enactment of the PUTSA, courts applying Pennsylvania law have continued to recognize a separate tort of conversion regarding confidential or proprietary information"). Accordingly, because the amended complaint pleads sufficient facts in support of a conversion claim against Gemma and the conversion claim is not preempted by PUTSA, Gemma's motion to dismiss (Doc. No. 46) is denied as to Count IV of the amended complaint.

The Court concludes that the amended complaint sets forth sufficient facts in support of a claim for conversion against the Everest Defendants. Liberty Mutual has alleged that the Everest Defendants used Liberty Mutual's proprietary information that it received via email from Gemma to compete against Liberty Mutual. (Doc. No. 37 ¶¶ 77-79.) In addition, the amended complaint avers that the Everest Defendants also acquired such information as a result of Gemma forwarding "Liberty Mutual information, including underwriting information, to his personal email address" prior to resigning from his position with Liberty Mutual and after his resignation, "forward[ing] the information to his Everest insurance email." (Id. ¶ 80.) Such allegations are sufficient to allege that the Everest Defendants "exercised wrongful control" over Liberty Mutual's property, which is required for a conversion claim. See Prudential, 994 F. Supp at 323-24. Consequently, the Everest Defendants' motion to dismiss (Doc. No. 49), is denied as to Count IV of the amended complaint.[16]

### 2. Violation of Pennsylvania Uniform Trade Secrets Act, 12 P.S. § 5301 (Count V)

---

[16] Because the Court has already determined, supra, that the conversion claim against Gemma is not preempted by PUTSA, the Court similarly concludes that the conversion claim against the Everest Defendants is not preempted by PUTSA.

In setting forth this claim, Liberty Mutual states that it possesses numerous categories of trade secrets, including, inter alia, "confidential, proprietary and competitively sensitive information about existing and prospective policyholders, such as names, contact information, policy numbers, . . . underwriting information, [and] claims history." (Doc. No. 37 ¶ 143.) Liberty Mutual also alleges that "Defendants obtained [its] trade secrets by improper means and used them in breach of obligations to Liberty Mutual including, among other things, fiduciary duties and contractual obligations," and that in doing so, Defendants have engaged in misappropriation under PUTSA. (Id. ¶¶ 146-47.) Both Gemma and the Everest Defendants argue that Liberty Mutual's PUTSA claim is insufficient because the amended complaint neither describes the alleged trade secrets involved with sufficient specificity (Doc. No. 47 at 11-2), nor "explain[s] how an Everest Defendant obtained the trade secrets or used the trade secrets, which trade secrets were used, or when that use occurred" (Doc. No. 50 at 10-11).

A PUTSA violation consists of the following elements: "(1) the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3) use of the trade secret, in violation of that confidence; and (4) harm to the plaintiff." Moore v. Kulicke & Soffa Indus., Inc., 318 F.3d 561, 567 (3d Cir. 2003). Under this standard, the amended complaint is sufficient, as Liberty Mutual alleges that Gemma misappropriated various documents, including customer lists and other customer information, which have been held to constitute trade secrets. See, e.g., Latuszewski, 2007 WL 4462739, at *16-17 (concluding that "customer information" taken by employees "qualifies as trade secrets" and that "[s]uch information includes customer lists, account balances, [and] account activity"). In addition, the facts pled support the existence of a confidential relationship between Liberty Mutual and Gemma under which Gemma gained access to the documents. (Doc. No. 37 ¶¶ 49-52.) Further,

the amended complaint states that Defendants used the trade secrets in such a way that violated that confidence, as Liberty Mutual avers that the Everest Defendants used the information from Gemma and acquired it via improper means. (Id. ¶¶ 77-82, 90-108.) Lastly, Liberty Mutual has alleged that it was harmed by the misappropriation on the part of Defendants. (Id. ¶¶ 115-16.) Such factual allegations are thus sufficient to satisfy the required elements for a PUTSA claim.

In addition, while Defendants state that the amended complaint lacks the requisite specificity to survive a 12(b)(6) motion and does not identify the misappropriated trade secrets with "reasonable particularity" (Doc. Nos. 47 at 11, 50 at 10), the amended complaint sets forth sufficient facts to support a PUTSA claim, as a claim for misappropriation of trade secrets does not need to be pled in accordance with a heightened pleading standard. See Nicolo v. Patterson Belknap Webb & Tyler, LLP, No. 2:13-cv-706, 2014 WL 1248034, at *7 (W.D. Pa. Mar. 26, 2014) (denying motions to dismiss and stating that "[a]n additional showing of proof or probability is not required" for there to be a sufficient factual basis for misappropriation of trade secrets). Furthermore, the amended complaint has satisfied the governing pleading standard, as Liberty Mutual has identified separate categories of documents containing trade secrets that it alleges were misappropriated by Defendants, and has further identified the type of information contained within each category, such as confidential information pertaining to customers. (Doc. No. 37 ¶¶ 93-106.) Such specificity regarding the identification of the property has been deemed sufficient for purposes of a claim for misappropriation of trade secrets. See, e.g., Ideal Aerosmith, Inc. v. Acutronic USA, Inc., No. 07-1029, 2007 WL 4394447, at *8 (E.D. Pa. Dec. 13, 2007) (citing Freedom Med. Inc. v. Gillespie, 634 F. Supp. 2d 490, 517 (E.D. Pa. 2007)) ("Plaintiff further alleged that the [emails] contained trade secret and confidential business information and other property 'including proprietary development specifications for . . . pricing

data, marketing information, product bid information, and customer communications.' . . . This constitutes adequate identification of the trade secret material for pleading purposes."). Accordingly, both Gemma's and the Everest Defendants' motions to dismiss (Doc. Nos. 46, 49), are denied as to Count V of the amended complaint.

### 3.    Unjust Enrichment (Count VII)

Count VII of the amended complaint puts forth a claim for unjust enrichment against both Gemma and the Everest Defendants.  (Doc. No. 37 at 31.)  In support of this Count, Liberty Mutual asserts that "Defendants have been or will be unjustly enriched through [their] improper actions and conduct, including but not limited to the use of confidential policyholder information and relationships created and maintained at the expense of Liberty Mutual, as well as the improper targeting of existing and prospective Liberty Mutual policyholders and relationships." (Doc. No. 37 ¶158.)  In support of his motion to dismiss, Gemma asserts that a claim for unjust enrichment is possible "only in the absence of a contract," while Liberty Mutual has admitted "that a contract (i.e., the Agreement) defines the rights of the parties."  (Doc. No. 47 at 13.)  The Everest Defendants argue that the amended complaint does not state a claim for unjust enrichment because the allegations "fail to include any facts showing what allegedly protected confidential policyholder information any Everest Defendant obtained, when and how it was obtained, or how it was used."  (Doc. No. 50 at 11.)

The following elements are necessary for a plaintiff to state a claim for unjust enrichment: "(1) benefits conferred on one party by another; (2) appreciation of such benefits by the recipient; and (3) acceptance and retention of these benefits in such circumstances that it would be inequitable for the recipient to retain the benefits without payment of value."  Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 277 (3d Cir. 2007) (citing Allegheny Gen.

Hosp. v. Philip Morris, Inc., 228 F.3d 429, 446 (3d Cir. 2000)). Further, "[a]lthough plaintiffs are free to pursue the alternative theories of recovery of breach of contract and unjust enrichment, the finding of a valid contract prevents a party from recovering for unjust enrichment as the measure of damages is limited to that which is provided in the contract itself." Halstead v. Motorcycle Safety Found., Inc., 71 F. Supp. 2d 455, 359 (E.D. Pa. 1999) (citing United States v. Kensington Hosp., 760 F. Supp. 1120, 1135 (E.D. Pa. 1991)). "However, . . . a claim for unjust enrichment will not be barred if it concerns conduct outside the scope of the original agreement or contract." Kraus Indus., Inc. v. Moore, Civil Action No. 06-00542, 2007 WL 2744194, at *8 (W.D. Pa. Sept. 18, 2007)).

The Court concludes that under the above standard, Liberty Mutual has pled sufficient facts to support a claim of unjust enrichment against all Defendants. Initially, the Court rejects Gemma's argument that Liberty Mutual is barred from asserting an unjust enrichment claim against him because it has also set forth a breach of contract claim, as dismissal of an unjust enrichment claim is improper in instances, such as the instant case, where the parties dispute the enforceability of the contractual provisions at issue. See, e.g., Brown & Brown, Inc. v. Cola, 745 F. Supp. 2d 588, 626 (E.D. Pa. 2010) (summarizing applicable case law and stating that "[g]iven that the parties have not fully admitted that [the defendants] are subject to the terms of a valid enforceable [e]mployment [a]greement, it is premature at this juncture to dismiss the unjust enrichment claim"); Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 507 (E.D. Pa. 2008) (citing Fed. R. Civ. P. 8(a)) ("Because the Federal Rules of Civil Procedure enable the plaintiffs to plead in the alternative, a claim for breach of contract and unjust enrichment can coexist at this early stage of litigation.").

In addition, Liberty Mutual has adequately pled facts that establish a claim for unjust enrichment against Gemma, as the amended complaint alleges that Gemma received a benefit from Liberty Mutual in that he came into possession of several documents containing valuable policyholder information (Doc. No. 37 ¶¶ 45-54), Gemma appreciated the benefit of possessing such information by forwarding it to himself and others, allegedly for use in competing against Liberty Mutual (Id. ¶¶ 77-80, 90-104), and Gemma retained this information and its accompanying value in such a fashion that Liberty Mutual alleges is unjust (Id. ¶¶ 109-16). Accordingly, Gemma's motion to dismiss (Doc. No. 46), is denied as to Count VII of the amended complaint.

Further, the Court also concludes that Liberty Mutual's amended complaint sets forth a sufficient factual basis for an unjust enrichment claim against the Everest Defendants. The amended complaint asserts that, "Liberty Mutual and Northwood enjoyed an affinity/group savings relationship and a marketing relationship for years," and that as a result of these relationships, "Liberty Mutual offered, and Northwood accepted, substantial discounts off Liberty Mutual's insurance pricing for Northwood and its customers." (Doc. Nos. 54 at 18, Doc. No. 37 ¶¶ 30, 41.) The Court also agrees that, given Liberty Mutual's allegations as to the valuable nature of its policyholder information, Liberty Mutual has pled sufficient facts demonstrating that it would be "inequitable for the Everest Defendants to retain [such] benefits." (Doc. No. 54 at 18.) The Everest Defendants' motion to dismiss (Doc. No. 49), is therefore denied as to Count VII of the amended complaint.

### 4. Tortious Interference (Count VIII)

In arguing that Liberty Mutual has failed to state a claim for tortious interference, Gemma maintains that the amended complaint is insufficient in that the complaint: "fails to

identity a single contractual relationship other than with [Liberty Mutual's] policyholders";
Liberty Mutual's contract with Northwood ended in November of 2015; "[t]here is no allegation
that Gemma's actions were specifically designed to harm" Liberty Mutual; no "improper
conduct" on the part of Gemma has been identified; the amended complaint does not specifically
state a claim for damages; and Liberty Mutual "fails to posit a theory as to why there is a
reasonable likelihood that it would have been able to sell insurance to Northwood's future home-
buying customers but for Gemma's interference."  (Doc. No. 47 at 14-15.)  Similarly, the Everest
Defendants maintain that the amended complaint: lacks allegations that identify the specific
contractual relationships with which they allegedly interfered; the facts alleged do not indicate
that the Everest Defendants acted without privilege or justification; Liberty Mutual has not pled
that any existing or prospective contractual relationships were harmed by the alleged
interference; and the amended complaint does not provide sufficiently specific allegations
regarding damages.  (Doc. No. 50 at 13-15.)

     In opposition, Liberty Mutual states that it has alleged relationships with which the
Defendants tortuously interfered, pointing to its "affinity/group savings and marketing
contractual relationships" and its "contractual and economic relationships with existing and
prospective Liberty Mutual policyholders."  (Doc. Nos. 54 at 19, 55 at 22.)  Further, it states that
its amended complaint provides numerous allegations the Defendants intended to harm and
harmed its contractual relationships while acting without privilege or justification (Doc. Nos. 54
at 23, 55 at 20), and that Liberty Mutual has alleged that it suffered harm as a result of such
interference (Doc. Nos. 54 at 21, 55 at 24).  Finally, it argues that the fifth element of a tortious
interference claim applies only to its "prospective relationships with prospective Liberty Mutual
policyholders and, as to those relationships, the [amended] [c]omplaint sufficiently alleges that

there was a reasonable likelihood that those relationships would have occurred but for Gemma's tortious interference."  (Doc. No. 55 at 24.)

In Pennsylvania, a claim for tortious interference with existing or prospective contractual relationships consists of the following elements:

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference.

Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 212 (3d Cir. 2009) (citing

Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 530 (3d Cir. 1998)).

Under the applicable legal standard, Liberty Mutual's amended complaint has stated a claim for tortious interference against all Defendants.  First, the Court agrees with Liberty Mutual that the amended complaint sufficiently alleges the relationships with which Defendants interfered, including its "affinity/group savings and marketing contractual relationships" involving Northwood, as well as its relationships with "existing and prospective Liberty Mutual policyholders."  (Doc. Nos. 55 at 22, 37 at ¶¶ 30, 42, 163-64, 82-89.)  As to alleged interference with its current contractual relationships, the amended complaint states that "[a]lthough one contractual aspect of the relationship between Liberty Mutual and Northwood ended in 2015, Gemma continued to be Liberty Mutual's lead contact person for Northwood."  (Doc. No. 37 ¶ 42.)  Consequently, Liberty Mutual has put forth sufficient allegations with respect to its actual contractual relations.  See, e.g., Advanced Fluid Sys., Inc. v. Huber, 28 F. Supp. 3d 306, 336 (M.D. Pa. 2014).  Further, with regard to prospective contractual relations, the amended

complaint alleges facts establishing Liberty Mutual's relationships with prospective customers. (Doc. No. 37 ¶¶ 45-47, 61, 108, 111.) Given Gemma's allegedly extensive involvement with developing Liberty Mutual's customer relationships, as set forth in the amended complaint, Liberty Mutual "sufficiently alleges a reasonable expectation of realizing these prospective contracts." See Advanced Fluid Sys., 28 F. Supp. 3d at 337.

The amended complaint alleges sufficient facts to support the remaining elements of a claim for tortious interference as well. With respect to the second element – that the defendant acted purposefully and with a specific intent to harm the contractual relationships at issue and without privilege or justification – the amended complaint contains numerous allegations that all Defendants acted improperly through concerted action that was intended to favor a competing insurance agency at the expense of Liberty Mutual. (Doc. No. 37 ¶¶ 66, 73-74, 77-80, 82-89, 165-70.) Such allegations are sufficiently removed from "socially acceptable" standards in business relationships so as to satisfy this second element. See Empire Trucking Co., Inc. v. Reading Anthracite Coal Co., 71 A.3d 923, 936 (Pa. Super. Ct. 2013) (affirming denial of request for judgment notwithstanding the verdict against defendant-appellant in action for breach of contract and tortious interference). In addition, as indicated supra, the amended complaint has sufficiently alleged the absence of privilege or justification on the part of Defendants, as Liberty Mutual avers that the Defendants worked with each other to benefit from Gemma's unauthorized transmittal of Liberty Mutual's proprietary customer information for the purpose of acting against Liberty Mutual's interest by forming a competing insurance company. See Advanced Fluid Sys., 28 F. Supp. 3d at 338-39 (denying in part motion to dismiss and acknowledging that defendants acted wrongly in that they "foiled [the plaintiff's] chances at receiving certain contracts"). Further, the amended complaint describes the ways in which Defendants' alleged

conduct harmed Liberty Mutual by causing it to lose customers and referrals from Northwood (Doc. No. 37 ¶¶ 42, 116, 89, 171), as well as facts that demonstrate a reasonable likelihood that Liberty Mutual would have had certain prospective contractual relationships with policyholders, were it not for the Defendants' actions.[17] Because the Court concludes that Liberty Mutual has alleged sufficient facts to state a claim for tortious interference as to all Defendants, both motions to dismiss (Doc. Nos. 46, 49), are denied as to Count VIII of the amended complaint.

### 5.      Civil Conspiracy (Count IX)

Under Pennsylvania law, "[a] civil conspiracy cause of action requires that two or more persons combine or enter an agreement to commit an unlawful act or to do an otherwise lawful act by unlawful means." Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc., 801 F. Supp. 1450, 1458 (E.D. Pa. 1992) (citing Burnside v. Abbott Labs., 505 A.2d 973, 980 (Pa. Super. Ct. 1985)). Specifically, a plaintiff must show: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." DePuy Synthes Sales, Inc. v. Globus Med., Inc., 259 F. Supp. 3d 225, 247-48 (E.D. Pa. 2017) (citing Gen. Refractories Co. v. Fireman's Fund. Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003)). In addition, "[p]roof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." Id. at 248 (alteration in original) (quoting Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979)). "Thus, a showing that a person acted for professional reasons,

---

[17] For example, the amended complaint details how, as a result of certain alleged acts by Defendants at the expense of Liberty Mutual, Northwood personnel changed the way they interacted with Liberty Mutual representatives, Liberty Mutual employees other than Gemma were told not to return to a Northwood office, and Liberty Mutual "suddenly stopped receiving referrals from Northwood" via its automated system "[o]n the very day Gemma resigned." (Doc. No. 37 ¶¶ 75-76, 87.)

and not solely to injure the plaintiff, negates a finding of malice." Id. (citing Sarpolis v. Tereshko, 26 F. Supp. 3d 407, 423-24 (E.D. Pa. 2014)).

Under the above standard, the Court concludes that Liberty Mutual has failed to state a claim against the Defendants for civil conspiracy, as the amended complaint fails to allege that Defendants acted with malice. As the Everest Defendants note in support of their motion, Liberty Mutual's allegations center around Defendants acting together for the purpose of setting up an insurance business to compete with Liberty Mutual. (Doc. No. 50 at 16-17 (citing Doc. No. 37 ¶¶ 1, 3, 174-75.)) Therefore, the amended complaint fails to state a claim for civil conspiracy. See Depuy Synthes Sales, 259 F. Supp. 3d at 248 (summarizing case law indicating that allegations that defendants acted for business-related motive, rather than with malice, renders a claim for civil conspiracy improper). Accordingly, the Court will grant Gemma and the Everest Defendants' motions to dismiss (Doc. Nos. 46, 49), as to Count IX of the amended complaint.

### 6.    Unfair Competition (Count X)

Under Pennsylvania law, unfair competition is generally viewed "as the 'passing off' of a rival's goods as one's own, creating confusion between one's own goods and the goods of one's rival." Giordano v. Claudio, 714 F. Supp. 2d 508, 521 (E.D. Pa. 2010) (citing Scanvec Amiable Ltd. v. Chang, 80 F. App'x 171, 180 (3d Cir. 2003)) (summarizing Pennsylvania case law pertaining to unfair competition). "However, the doctrine of unfair competition . . . is not restricted to passing off." Id. (citing Granite State Ins. Co. v. Aamco Transmissions, Inc., 57 F. 3d 316, 319 (3d Cir. 1995)). In addition, "Pennsylvania courts have recognized a cause of action for . . . unfair competition where there is evidence of, among other things . . . tortious interference with contract, improper inducement of another's employees, and unlawful use of

confidential information." Synthes (U.S.A.) v. Globus Med., Inc., No. 04-cv-1235, 2005 WL

2233441, at *8 (E.D. Pa. Sept. 14, 2005). "Nevertheless, the term may not be construed as 'a

virtual catch-all for any form of wrongful business conduct.'" Giordano, 714 F. Supp. 2d at 522

(citing USA Corp. v. Adriatic Ins. Co., 99 F. Supp. 2d 593, 619 (W.D. Pa. 2000)).

The Court concludes that the amended complaint fails to state a claim for unfair

competition. While Liberty Mutual avers that unfair competition "encompasses a wide variety

of wrongful conduct, including . . . breach of the duty of loyalty, tortious interference . . . ,

improper use of confidential, trade secret information, violation of restrictive covenants, and

misappropriation" (Doc. No. 37 ¶ 181), the amended complaint does not identify a specific

market impact as a result of Defendants' alleged conduct (Id. ¶¶ 179-84).[18] Consequently,

Liberty Mutual's allegations with respect to Defendants' conduct are insufficient to state a claim

for unfair competition. See, e.g., Fleming Steel Co. v. Jacobs Eng'g Grp., Inc., No. 2:16-cv-727,

2016 WL 9409024, at *9 (W.D. Pa. Dec. 29, 2016) (granting motion to dismiss as to unfair

competition claim and noting that amended complaint "fails to define any relevant geographic or

product market . . . [and] does not allege sufficient facts from which a relevant market can be

determined"); AutoTrakk, LLC v. Auto. Leasing Specialists, Inc., No. 4:16-CV-01981, 2017 WL

2936730 (M.D. Pa. July 10, 2017) ("[I]t is difficult to fathom the imposition of liability for

alleged unfair competition where it cannot be discerned from the complaint that the offending

---

[18] While Liberty Mutual makes clear that it alleges that Defendants are competing against it in
the insurance industry, the amended complaint does not indicate the specific ways in which
Defendants have competed against Liberty Mutual in such a way that would constitute an impact
on the relevant market. Rather, the extent of Liberty Mutual's allegations in this regard appear to
be that Gemma "has viewed his relationships at Northwood as being 'fair game' and has
continued to contact and solicit Northwood concerning the sale of insurance, . . . [and] has
continued to contact and solicit insurance from Northwood personnel," and that "Northwood
personnel is conducting and/or referring insurance business to Defendants[,] which has harmed
Liberty Mutual." (Id. ¶¶ 114-15.)

company mobilized misappropriated information in a way that had a tangible market impact."). Accordingly, Defendants' motions to dismiss (Doc. Nos. 46, 49), are granted as to Count X of the amended complaint.

### 7. Application of the Gist of the Action Doctrine to Certain Claims

In support of his motion to dismiss (Doc. No. 46), Gemma also argues that Liberty Mutual's claims for conversion, tortious interference, civil conspiracy, and unfair competition are barred by the gist of the action doctrine (Doc. No. 47 at 16). Because the Court has already concluded that Liberty Mutual has failed to state a claim as to either civil conspiracy or unfair competition, the Court will address Gemma's argument only with respect to Liberty Mutual's claims for conversion and tortious interference.

The purpose of the gist of the action doctrine is to distinguish between tort and breach of contract claims. See, e.g., eToll, Inc. v. Elias/Savion Advert., Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002) (noting that "the doctrine is designed to maintain the conceptual distinction between breach of contract claims and tort claims" and that "[a]s a practical matter, the doctrine precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims"). In examining whether a claim sounds in tort, rather than contract, courts view "the nature of the duty alleged to have been breached, as established by the underlying averments supporting the claim in a plaintiff's complaint . . . as the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract." Bruno v. Erie Ins. Co., 196 A.3d 48, 68 (Pa. 2014) (footnote omitted). As to the underlying duty, "[t]he important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus." eToll, 811 A.2d at 14 (quoting Redevelopment Auth. v. Int'l Ins. Co., 685 A.2d 581, 590 (Pa. Super. Ct. 1996)).

Under the applicable law described <u>supra</u>, neither the conversion claim nor tortious interference claim is barred by the gist of the action doctrine, as both claims arise from an alleged breach of duties imposed by social policy, rather than the terms of any contractual agreement. As Liberty Mutual notes in opposition to Gemma's motion, "[t]hese tort claims are centered on Gemma's actions, in conjunction with [affiliates of Everest], establishing and building up Everest Insurance and ultimately usurping Liberty Mutual's relationship with Northwood." (Doc. No. 55 at 27) (citing Doc. No. 37 ¶¶ 66-89.) Accordingly, because the alleged breach of duty underlying the conversion and tortious interference claims sounds in social policy, rather than any employment agreement, the claims are not barred by the gist of the action doctrine. <u>See, e.g.</u>, <u>USG Ins. Serv., Inc. v. Bacon</u>, No. 2:16-cv-01024, 2016 WL 6901332, at *7-9 (W.D. Pa. Nov. 22, 2016) (concluding claim was not barred by gist of the action doctrine when, even though there was "substantial overlap" between contract claim and tort claim, the tort claim "state[d] enough distinct facts to give it a legal basis separate and apart from the [a]greement").

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss Liberty Mutual's amended complaint (Doc. Nos. 46, 49), are granted in part and denied in part.[19] An Order consistent with this Memorandum follows.

---

[19] The Court is aware that Liberty Mutual has requested leave to amend its amended complaint in the introductory and concluding remarks of its briefs in opposition to Defendants' motions to dismiss. (Doc. Nos. 54 at 5-6, 24, 55 at 6, 28.) The Court's adjudication of Defendants' motions to dismiss does not preclude Liberty Mutual from attempting to seek leave to amend its amended complaint in accordance with the applicable federal and local rules. Should Liberty Mutual pursue any amendment, it must file a properly supported motion for leave to file a second amended complaint. <u>See</u> Fed. R. Civ. P. 15(a).